HANLON, Respondent, v. MANGER et al., Appellants.

(No. 6,425.)

(Submitted April 3, 1929. Decided May 10, 1929.)

[277 Pac. 433.]

*Mr. Edward Horsky* and *Mr. Charles L. Tyman,* for Appellants, submitted a brief; *Mr. Horsky* argued the cause orally.

*Mr. C. A. Linn* and *Messrs. Brown, Wiggenhorn & Davis,* for Respondent, submitted a brief; *Mr. Horace S. Davis* argued the cause orally.

MR. JUSTICE FORD delivered the opinion of the court.

This action was brought by plaintiff against defendants to recover damages claimed to have been sustained by him for the alleged breach of two sales contracts, entered into contemporaneously on July 9, 1925.

The complaint contains two causes of action. Under the terms of the first contract, the basis of the first cause of action, defendants sold to plaintiff 1,500 head of breeding ewes, with solid, sound mouths, to be selected by defendants from sheep then owned by them, at $8 per head, to be delivered f. o. b. cars at Ringling "on or about the 15–20 day of October, 1925." It was stipulated that all sheep with bad or spoiled bags were excluded, and that "said seller [defendants] agrees that said livestock is to be free from all diseases, in good merchantable condition. The live stock covered by this agreement is bought subject to federal and state inspection and does not include cull, cripple, sick or loco animals." The sum of $1,500 was paid on the purchase price.

Under the second contract, the basis of plaintiff's second cause of action, defendants sold to plaintiff all of the tail end and broken-mouthed ewes owned by them for a consideration of $3.50 per hundred weight, delivery to be made "on or about the 15–20 day of October, 1925," at buyer's [plaintiff's] option. Defendants agreed that the sheep were to be free from all diseases, in good merchantable condition, culls, crippled and locoed animals not to be included. Of the purchase price, $250 was paid by plaintiff. The balance of the purchase price, under each contract, was to be paid at the time of the delivery of the sheep.

The complaint alleges the execution and delivery of the contracts; the down payments; notification to and demand of defendants to select and deliver the 1,500 head of breeding

ewes and all tail end and broken-mouthed ewes owned by defendants, and that plaintiff was ready, able and willing to pay the balance of the purchase price upon delivery, and, generally, that he had performed all the conditions of such contracts on his part; that defendants had at all times wholly and entirely failed, refused and neglected to deliver to plaintiff, or to his order, or otherwise, the sheep described in their contracts. Plaintiff demanded judgment for $7,500, together with $250 for expenses and lost time on the first cause of action, and $850, with $250 for expenses and lost time on the second cause of action.

Defendants' answer admits the execution of two certain contracts, but denies that true copies thereof are set forth in the complaint; admits that defendants were the owners of 400 tail end and broken-mouthed ewes and the down payments as alleged in plaintiff's complaint, and denies all other allegations.

As an affirmative defense, and by way of cross-complaint, the answer alleges that plaintiff rescinded both contracts and that defendants consented thereto and offered to return all moneys received by them, together with interest thereon, which tender was refused by plaintiff; that their tender was kept good by deposit in a reputable bank; and further alleges their ability and willingness to pay such money, and that they had performed all the conditions of each of the contracts on their part to be performed.

Issue was joined by reply. Trial by jury resulted in a verdict for plaintiff for $4,500 on the first cause of action and $450 on the second cause of action. Judgment was entered on the verdict from which defendants appeal.

The sole question presented by the various specifications of error is whether there is any substantial evidence to support the verdict and the judgment rendered thereon.

No motion for a new trial was filed. In this jurisdiction the rule is settled that in such cases the review of the evidence by this court is limited to an examination of the record to determine whether there is any substantial evidence

to support the verdict. The rule is thus succinctly stated by Mr. Justice Galen, speaking for the court in the case of *Clifton-Applegate & Toole* v. *Drain District No. 1*, 82 Mont. 312, 267 Pac. 207: "Where, as here, the record contains a bill of exceptions certified as authorized by the statute, but there appears to have been no motion made for a new trial, it will be examined solely to ascertain whether the verdict or judgment is supported by any substantial evidence. [Citing cases.] We may go no further in consideration of the evidence than was permissible under our former practice on an appeal from the judgment alone. This rule is established, and, while it may appear somewhat illogical, yet we must continue to follow it until the legislature sees fit to change it—a simple process in the event it be found unsatisfactory. The correctness of the rule is conceded by counsel for the plaintiff. Applying it to this case, we find that we must consider the evidence, as the plaintiff contends that there is no evidence whatsoever to support the verdict. If there is no evidence to sustain it, it is manifest it should not be permitted to stand. On such a record we may not make examination into conflicting evidence or the weight of evidence, any more than was permissible under the former practice on an appeal from the judgment alone. And the rule is firmly established that, where there is substantial conflict in the evidence, this court will not interfere with the judgment. But where, as here, the judgment is attacked because of a total failure of supporting evidence, a question of law is presented requiring an examination of the testimony (*Whithers* v. *Kemper*, 25 Mont. 432, 65 Pac. 422), and, if no substantial evidence is found to support a verdict, it should be plain that the court was in error in entering the judgment."

The testimony shows the execution and delivery of the contracts and the down payments as alleged in the complaint; that on October 18, 1925, plaintiff demanded delivery of the sheep, and that defendants advised him that delivery would be delayed a few days; this was satisfactory to plaintiff. On October 20 plaintiff returned to his home in Billings, leaving

two employees, Frazier and Stewart, with instructions to accept delivery of, inspect, and pay for the sheep. On October 22 plaintiff's employees visited the ranch of defendants and were advised that delivery would be made the following day. Accordingly, on October 23, defendants tendered to plaintiff one band of 1,300 and another of 1,200 head of sheep from which to select 1,500 head under the first contract. Approximately 1,400 head had been inspected by plaintiff's employees, about 800 having been rejected, when a controversy arose as to the sheep rejected; Russell Manger, hereafter called defendant, insisting that animals of the class described in the contract were being improperly rejected. Up to this point there is little conflict in the testimony. Frazier testified, after relating the facts leading up to the controversy, that defendant said: "Well, if you are going to reject that kind of sheep we might as well quit. I sold these sheep to Mr. Hanlon, let him come and receive them." Stewart testified: "Then Mr. Manger stopped us; said the deal was off, and said, 'If you don't take them kind of sheep you don't do it,' or something to that effect. After we were stopped from mouthing and sorting any more sheep at the Cook ranch on the 23d day of October, 1925, Mr. Manger took Mr. Frazier and me back to town. He [Manger] stopped me from mouthing the sheep and told me the deal was off. He told me to quit my examination too; he told me if we wasn't going to take sheep like that, the deal was off. I quit and Frazier quit too. Frazier was in the corral. Frazier stopped because Mr. Manger refused to turn the sheep over according to contract."

The witness Work testified: "I heard Manger say that he thought they had better not mouth any more sheep, and perhaps call the deal off if that was the way they were going to mouth them."

In defense, Manger testified: "When Mr. Stewart had finished mouthing the second chute, I said it was no use to proceed further if he was going to reject sheep like that, and that Mr. Hanlon himself would have to come up and receive

the sheep. Mr. Stewart's reply to that was that it was all right. He then discontinued." Defendant further testified that at the same time he tendered 400 broken-mouthed and tail end ewes under the second contract, "but Mr. Frazier said that, in view of the fact that Mr. Hanlon was coming up himself to receive the others, it would be better to make the complete delivery at one time under both contracts."

Relative to the sheep tendered under the second contract, Frazier testified: "I just saw the broken-mouthed or tail end ewes that Mr. Manger spoke about when we were leaving, they were in the corral. I didn't pay too much attention to them because I figured we would go through them when we received them. I observed they were very shelly. I mean by that that they were thin and very common. These sheep I saw were not in good flesh. From the observation I made from the fence, I would not call them tail end or broken-mouthed ewes in good condition, merchantable condition, free from diseases."

No more sheep were inspected and defendant took Stewart and Frazier to White Sulphur Springs. On the same day Stewart advised plaintiff by telephone of the controversy which had arisen and on October 26 Hanlon returned to White Sulphur Springs. There was a conference between plaintiff and defendant. The record is not clear as to what transpired, other than it was agreed that they would go to the Cook ranch the following morning to look over the sheep. Accompanied by several employees, plaintiff went to the Cook ranch early in the morning of the 27th. After waiting for defendant for approximately two hours, defendant not having arrived the party started back to town and met defendant on his way to the ranch. A casual conversation was had. Plaintiff testified that he told defendant he was returning to town, to which defendant replied: "We will be right in and see you." Defendant testified: "Before we got to the Cook ranch we met Mr. Hanlon. Mr. Hanlon said the weather was awfully bad and he didn't see how it would be possible to do anything today; that he would go to town and see us there, and we said

that would be all right." Plaintiff and party proceeded to town, had dinner, and, defendant not having returned, they left on the afternoon train for Billings. Defendant reached town after plaintiff had departed. En route, plaintiff wired defendant: "Sorry did not see you before train left—am proceeding to Billings from where will advise you regarding contract on sheep between you and your mother and myself."

On October 28 defendants wired plaintiff: "We stand ready and willing to deliver fifteen hundred ewes according to contract and will let William Rae, Jr., select them according to contract." On the same day plaintiff consulted his attorneys and directed them to take whatever action was necessary to recover the damages sustained by him by reason of defendants' breach of the contracts. After some correspondence between attorneys representing the parties, defendants on November 9, 1925, tendered plaintiff the moneys paid upon the purchase price, together with interest to date, which was refused by plaintiff. The money was then deposited in a bank to plaintiff's credit, where it remained. This action followed.

Counsel contend that defendants tendered to plaintiff sheep of the character described in the contracts and which plaintiff refused to accept.

From what has been said it is clear that on this question the evidence is in hopeless conflict. Plaintiff offered evidence tending to show that the sheep tendered by the defendants were not of the kind and quality described in the contracts; that they were not free from all diseases, not in good merchantable condition, and included culls, crippled, sick, and locoed animals. Defendants offered testimony to the contrary. Thus the evidence presented a question for the jury as to whether the sheep tendered were of the kind and quality described in the contracts. (*Clifton* v. *Wilson*, 47 Mont. 305, 132 Pac. 424; *Lehrkind* v. *McDonnell*, 51 Mont. 343, 153 Pac. 1012.)

It is next contended that, since time was not made of the essence of the contracts, defendants had a reasonable time after October 18 within which to make tender, and that a

reasonable time had not elapsed, after demand for performance was made, when plaintiff gave notice of his election to stand upon the breach which he asserted. All authorities agree that, when time is not made of the essence of the contract, the seller is entitled to a reasonable time after notice within which to make delivery, but he cannot delay delivery beyond a reasonable time. (35 Cyc. 182; *Curtis* v. *Parham*, 49 Mont. 140, 140 Pac. 511; *Burden* v. *Elling State Bank*, 76 Mont. 24, 46 A. L. R. 906, 245 Pac. 958.) And it is generally held that what is a reasonable time is a question of fact to be determined by the jury. (*Curtis* v. *Parham, supra; Sturtevant Co.* v. *Ford Mfg. Co.*, 315 Mo. 1025, 288 S. W. 59; *Rochester Distilling Co.* v. *Geloso*, 92 Conn. 43, 101 Atl. 500; *Barlow* v. *Lincoln-Williams Twist Drill Co.*, 186 Mich. 46, 152 N. W. 1034.) From the facts disclosed by the record, we are of the opinion that what was a reasonable time was, under the circumstances, a question of fact for the jury to determine.

Counsel insist that defendants' wire of October 28 constituted an offer to perform the contracts. We think not. An offer to perform, by the party upon whom the obligation rests, must be unconditional and made in good faith, coupled with the ability to perform. (*Lehrkind* v. *McDonnell, supra; Thomas* v. *Standard Dev. Co.*, 70 Mont. 156, 224 Pac. 870.) "Where a person is to perform an act, the obligation to perform which is independent of any precedent or concurrent act to be performed by the other party, the thing to be delivered must be tendered unconditionally." (13 C. J. 669.) "An offer of performance must be free from any conditions which the creditor is not bound, on his part, to perform." (Sec. 7440, Rev. Codes 1921.) Here defendants' offer of performance was conditioned that the sheep be selected by William Rae, Jr., and can avail defendants nothing.

Counsel insist that, because of a heavy snowstorm and attendant bad weather, beginning on the night of October 26 and extending through the following day, defendants were excused from making delivery; that delivery was impos-

sible. There are no allegations in the answer presenting this issue; the question is raised for the first time on appeal. Had defendants intended to rely on an act of God to excuse performance, it was essential to plead it by alleging the necessary facts constituting a defense under the plea. (*Orient Ins. Co. v. Northern Pac. Ry. Co.*, 31 Mont. 502, 78 Pac. 1036; *Chicago, R. I. & P. R. Co.* v. *Shaw*, 63 Neb. 380, 56 L. R. A. 341, 88 N. W. 508; *Hubbard* v. *Olsen-Roe Transfer Co.*, 110 Or. 618, 224 Pac. 636.) But even if the pleadings were sufficient to raise the question, the evidence fails to establish such defense.

"The general rule is that an absolute undertaking is not discharged by a subsequent act of God rendering the performance onerous or even impossible. And, although the promisor cannot be compelled to perform an undertaking impossible of performance through an act of God, he cannot, on the ground of hardship or impossibility, escape liability in damages, in the absence of a reservation covering such impossibility of performance." (13 C. J. 641.) The contracts in question contain no such reservation. "Default or delay is not excused because performance has become difficult, dangerous or burdensome. Thus it is no excuse that delivery is dangerous because of the existence of war, or because a pestilence prevails, or that it is difficult because of the inclemency of the weather." (35 Cyc. 245.)

Finally, it is contended by defendants that, if they failed to perform the contracts, or if there was any controversy as to whether the sheep were of the kind and quality required by the contracts, the same were waived and acquiesced in by plaintiff. We have carefully examined the record and there is not any evidence to sustain the contention.

For the reasons given, the judgment is affirmed.

Mr. Chief Justice Callaway and Associate Justices Matthews, Galen and Angstman concur.