BOEPPLE, Respondent, *v.* MOHALT, Appellant.

(No. 7,471.)

(Submitted December 17, 1935. Decided February 3, 1936.)

[54 Pac. (2d) 857.]

418

*Mr. M. J. Lamb*, *Mr. Raymond T. Nagle*, Attorney General, and *Mr. John W. Bonner*, Special Assistant Attorney General, for Appellant, submitted an original and a supplemental brief; *Mr. Lamb* and *Mr. Bonner* argued the cause orally.

420

*Mr. S. C. Ford* and *Mr. P. F. Leonard,* for Respondent, submitted an original and a reply brief and argued the cause orally.

422

424

MR. JUSTICE STEWART delivered the opinion of the court.

This is an appeal by the defendant Louis Mohalt, from a judgment entered against him in the district court of Custer county. The action arose out of an accident which occurred on United States highway No. 10, in Dawson county, on October 14, 1933:

Plaintiff and her husband, Christoph Boepple, together with their daughter, Mrs. Elma Nervas and her minor child, were returning to their home in Miles City from an automobile trip to

Chicago. Plaintiff, Mrs. Nervas, and the child were riding as guests of Christoph Boepple, who owned the car, a Model A 1928 two-door sedan, and drove it throughout the trip. Plaintiff rode in the front seat with her husband. Their daughter and her baby (about eighteen months old) occupied the rear seat. They left Glendive about 3 o'clock in the afternoon and proceeded along the highway in a southwesterly direction toward Miles City. At about 3:50 they arrived at a point approximately 20 miles from Glendive. At this point Boepple was driving upon the right, or north, side of the road, and according to his own testimony at a speed of about 35 or 40 miles per hour. While proceeding in this manner, he collided with a Galion patrol, which was owned by the state of Montana and which at that time was being operated by defendant Mohalt, as an employee of the state highway department, for the purpose of maintaining the highway. This patrol, hereinafter called the grader, was headed in an easterly direction toward Glendive, upon its left, or the north, side of the road. Just prior to the collision defendant had brought the grader to a momentary stop. It was not moving forward at the time of the collision.

Seeking damages for injuries suffered by her as a result of the accident, plaintiff instituted this action against the three members of the state highway commission, W. E. Bowden, the division engineer, and Louis Mohalt, operator of the grader. In the complaint it was alleged that the state of Montana was the owner of the grader, which was equipped with a blade used in the maintenance and repair of the highway; that defendant Mohalt for some time prior to the accident "operated the said motor patrol on the left or wrong side of the road," and in such manner that it covered nearly all of the roadway, and that he stopped it at the place of the collision. It was alleged that at the point where the grader was stopped on its left, or northerly, side of the highway there was a very steep hill that arose directly towards the east, and that at the summit of this hill there was a sharp curve in the road, "so that the said motor patrol

maintainer, as located, would not have been seen or observed by a traveler in an automobile while proceeding westerly towards said motor patrol on said highway until after the turn had been made at the top of said hill and at a point that would bring the automobile almost directly in front of the said motor patrol maintainer, and the said motor patrol maintainer could not be seen by the driver or occupant of an automobile approaching until within a very short distance of the said motor patrol''; that the grader, as so located, constituted a concealed and obscure obstruction to traffic, a public nuisance, and was dangerous to persons traveling on the highway. It was alleged that plaintiff and her husband were in the exercise of due care and caution and ''were keeping a lookout ahead for other automobiles, vehicles and other obstructions on said highway,'' but that notwithstanding they could not observe the grader until it was too late to stop their automobile, and as a result ran into it; that it was the duty of defendants to erect and maintain guides, warning signs, and signals on the highway where the grader was being operated, and to equip the grader with a horn, whistle and lights so that warning could be given to approaching traffic; that defendants negligently failed to perform such duties; that, because of such negligent acts of omission, neither plaintiff nor her husband was warned or had knowledge of the position of the grader until it was too late to avoid colliding therewith, and that as a result thereof plaintiff suffered personal injuries.

Separate demurrers were interposed by the respective defendants, and were overruled. Thereafter all the defendants joined in an amended answer, wherein they admitted some of the general allegations of the complaint, but denied all the allegations embodying charges of negligence, and by separate answer alleged that plaintiff was guilty of contributory negligence, and that the accident was due solely to the negligence of plaintiff and her husband.

The cause came on for trial, and, after plaintiff's evidence had been submitted, defendants moved for a nonsuit, which motion was granted as to all defendants except Mohalt. The

action proceeded against him alone. At the close of all of the evidence he moved for a directed verdict; the motion was denied. The cause was submitted to the jury, and resulted in a verdict against him for $11,569.70, upon which judgment was entered. From that judgment defendant Mohalt appealed.

Although several specifications of error have been urged, as we view the case, the principal question involved, and the only question necessary of determination here, is whether the evidence is sufficient to sustain the verdict.

Plaintiff asserts and relies upon the following alleged items of negligence: (1) Failure of defendant, in operating the grader, to observe the law relating to traffic; (2) parking the grader at a concealed or hidden point of a curve near the brow of a hill; (3) failure to use sufficient and reasonable means adequately and reasonably to protect the traveling public by signs and warnings. She charged defendant with negligence in all these particulars, and alleged that such negligence was the direct and proximate cause of the accident, and her injuries resulting therefrom.

Defendant contends that plaintiff failed to prove that he was guilty of negligence in any of the particulars charged, or in any manner; and that, if there can be said to be any proof of negligence on his part, still there is no proof that such negligence was the proximate cause of the accident and the injuries resulting therefrom; on the contrary, he asserts that the evidence shows conclusively that the accident was due solely to the negligence of Boepple.

In order for plaintiff to recover, it was, of course, incumbent upon her to prove, first, that defendant was negligent in at least one of the particulars charged, and, second, that such negligence was the proximate cause of her injuries. (*Stones* v. *Chicago, M. & St. P. Ry. Co.*, 59 Mont. 342, 197 Pac. 252; *Fulton* v. *Chouteau County Farmers' Co.*, 98 Mont. 48, 37 Pac. (2d) 1025.)

The accident occurred in the middle of the afternoon; no element of darkness was involved. The road was gravel sur-

face. Plaintiff testified that at a point some 4 or 5 miles east of the place of accident she and her husband saw a red flag alongside the road; that they remarked about that flag; that, after seeing it, her husband slowed the car down somewhat (to 30 miles per hour or less); that, after seeing the red flag, she (plaintiff) kept a rather close lookout for quite a ways, because she thought she had better keep a lookout for some obstruction; that just before she saw the grader she was talking to her daughter and the baby in the back seat, and, when she again faced the front and first observed the grader, they were "right square in front of it," and it so frightened her that she "must have fainted." She said that when she first saw the grader they were too close to avoid striking it; that it was clear over on the north side of the road; that just prior to the collision, if she had been looking, there was nothing aside from the brow of the hill to have interfered with her seeing the grader at a distance of 200 feet or more; that there was a little breeze blowing from the north to the south or southeast across the road; that there was a little dust but not enough to obstruct the view nor to have interfered with her seeing the grader.

Boepple testified to substantially the same facts. He stated that, after seeing the red flag, he slowed his car down some for a while (about three miles), but that just before colliding with the grader he had again increased his speed somewhat. He fixed his speed just prior to the collision at approximately 35 or 40 miles per hour. He said that just before the accident he passed a car which was going in the opposite direction, and about the same time he passed a mailbox on the side of the road to his right; that when he first saw the grader he was too close to avoid striking it; that he "slammed the brakes on" and tried to turn to the right, but that it was too late to avoid a collision. He testified that his eyesight was good, but that he would have had to be within 119½ feet of the grader in order to see which side of the road it was on, that he could have stopped his car in 150 feet if he had seen the grader, and that, if he could have seen it at 190 feet, he could have stopped.

Defendant's Exhibit 2 is a rectangular signboard mounted on a steel post about 4 feet in height. The board is painted white and has printed on it in large black lettering the words "Grader at Work." There was also a red flag attached to the signboard. This exhibit was admitted in evidence without objection. Defendant adduced considerable evidence to the effect that on the day of the accident this sign, or one identical to it, was posted on the north side of the highway and facing east, at the Brost ranch, about 4 or 5 miles east of the point of the accident. The evidence is practically conclusive that such a sign was posted there in the manner indicated. However, plaintiff and her husband both claim that they did not see any such sign, although they admit seeing a red flag at about that point. There is no evidence of any other signs of that character between that point and the place where the accident occurred.

It appears without contradiction that the grader was a large yellow machine 21.8 feet in length, 4.6 feet in width from center to center of front wheels, and 9.8 feet in height. Its weight was 13,625 pounds; it was equipped with a blade 12 feet in length, which covered 11 feet of space laterally when in operation. It had flags about 18 inches square extended from the frame and carried about 4 feet above the ends of the blade. It had been stopped at the north side of the highway for about one minute before the Boepple car came up, with the north end of the blade about one and a half feet over the north shoulder of the road, and the south end of the blade a little north of the center line of the road, in such manner as to leave approximately 12 or 13 feet in width along the south side of the traveled portion of the highway. The traveled portion of the highway at the point of the accident was 26 feet wide. The steep hill which plaintiff claimed existed at that point is shown by the evidence to have been only about a 4 per cent. grade; and the curve alleged to have existed at the top of the hill was shown to be only an angle of ten degrees, having a curve of 5 per cent. along a distance of 223 feet. It was designated by some of the witnesses as being only a slight curve.

Mohalt and other witnesses in his behalf testified that it was sometimes necessary to run the grader on the left or "wrong" side of the road in order to keep the road in proper condition, and a fair interpretation of all of the testimony on the subject indicates that such was the reason for the position of the grader at the time of the accident. Plaintiff sought by cross-examination to show that such procedure was not necessary, but she did not offer any direct evidence to controvert the advantages of such procedure. Mohalt testified that he had been operating that particular grader for about six months before the accident; that on the afternoon of the accident he was smoothing the highway, and for that purpose he was operating it along its left side of the road, occupying about one-half of its surface; that about one minute before the Boepple car came in sight he brought the grader to a complete stop because a car was about to pass him from the west, and he stopped until it had passed; that, when the car from the west had passed around him, he did not start the grader in motion because he could see the dust from the Boepple car approaching from the east about 1,000 feet distant, and that he therefore remained in a stationary position, intending to wait until the west-bound car had passed him. He said that he could see the Boepple car plainly when it arrived at a point approximately 600 feet east of the grader; that it was approaching at a speed of about 50 or 55 miles per hour upon its right side of the road; that, as the car continued to approach without any indication of turning out around the grader, he (Mohalt), fearing a collision, released the brake on the grader and tried to get into reverse, but was able only to move the grader back a few feet at the time when the collision occurred. When the car had approached to within 70 or 75 feet of the grader, Mohalt saw Boepple straighten up in the seat of his car and apparently apply his brakes. He testified that, when he saw Boepple coming along the road by the mailbox (239 feet east of the point of the accident) he did not do anything to attract Boepple's attention because he thought Boepple could see the grader, and that Boepple did not make any attempt to

432

turn out, or did not apply his brakes until about 50 or 75 feet from the grader.

Plaintiff's Exhibits J, K and L are photographs, taken by one Morang at the scene of the accident. They show the highway both at the point of the accident and for some distance east thereof. In taking the picture, Exhibit K, the camera was placed facing west on the highway about 4 feet in from the north side of the road and about 4½ feet above the surface thereof, at a point 239 feet east of the point of the accident. Boepple was there when the picture was taken. He stood at the point on the highway where the accident occurred. The picture shows that he was clearly visible from the point where the camera stood, 239 feet east, and at that distance it is clearly ascertainable from the picture upon which side of the road Boepple was standing. Morang, the photographer, testifying on behalf of plaintiff, stated on cross-examination that in taking the picture, Exhibit L, the camera was 434 feet east of the point of the accident, and that Boepple, who was standing at that point, could be seen. This picture discloses that Boepple could be seen at that distance, and also that it could be ascertained which side of the road he was standing on.

Defendant's Exhibits 8 to 14, inclusive, are pictures which were taken of the highway, at and near the point of the accident, with the grader placed in the exact position it occupied just before the collision. These pictures demonstrate that the upper portion of the grader was visible from a point on the highway 690 feet east of the grader; at a distance of 512 feet a portion of the grader was clearly visible, and at that distance it could be seen which side of the road the grader was standing on; at a distance of 286 feet the entire grader and its exact location on the road were clearly visible. The pictures, Exhibits 8 and 9, were taken from a distance of 159 feet and 222 feet east of the grader, respectively. In both of these pictures the grader stands out clearly, and the alleged curve is barely perceptible.

On the whole, the pictures all demonstrate clearly and beyond doubt that the alleged sharp curve and steep hill were in reality only of a slight nature; that Boepple's vision or ability to see the grader was in no way obstructed by the hill, curve, or anything else for a distance of at least 239 feet. The entire grader and its exact location on the road were clearly discernible at that distance. Indeed, the pictures demonstrate that there was no obstruction which could have prevented Boepple from seeing the grader at a distance of more than 400 feet, had he been keeping a proper lookout.

The physical facts, as shown by the photographs, together with the evidence, contradict the claims of plaintiff and disclose that there was unquestionably ample room for Boepple to have passed around the grader. This circumstance, together with Boepple's own statement that his eyesight was good, and the evidence showing conclusively that he could have easily stopped or avoided the grader if he had seen it at a distance of 239 feet, lead to the inevitable conclusion that the sole, direct and proximate cause of the accident was Boepple's failure to keep a proper lookout ahead. Clearly, there is no merit in the allegation that the grader was parked at a concealed or hidden point on a curve near the brow of a hill in such manner that Boepple could not see it until he was too close to avoid the collision. The only evidence disclosed by the record which would tend to controvert this conclusion is Boepple's testimony that he would have had to be within 119½ feet of the grader in order to determine which side of the road it was on, and that he did not see the grader in time to avoid colliding with it, and the bare assertion of Boepple and plaintiff that they were keeping a lookout ahead. This is not enough to support plaintiff's contention that the verdict of the jury on the point in question is sustained by the evidence.

The allegations of negligence in plaintiff's complaint and the evidence to sustain them given by plaintiff and her husband on the witness-stand come within the rule recognized in *Casey* v. *Northern Pacific Ry. Co.*, 60 Mont. 56, 198 Pac. 141, 145, where

it was said: "Whenever the surrounding circumstances make the story of a witness highly improbable or incredible, or whenever the testimony is inherently impossible, a new trial should be ordered. Physical conditions may point so unerringly to the truth as to leave no room for a contrary conclusion based on reason or common sense, and under such circumstances the physical facts are not affected by sworn testimony which in mere words conflicts with them."

In the case of *Morton* v. *Mooney*, 97 Mont. 1, 33 Pac. (2d) 262, 265, the court said: "It is true that, where the record presents a conflict in the evidence, resolved by the jury in favor of the plaintiff, the action of the jury precludes this court from disturbing the verdict, * * * but this is true only when there is substantial evidence in the record to support the verdict and judgment. * * * Substantial evidence is such as will convince reasonable men and on which such men may not reasonably differ as to whether it establishes the plaintiff's case, and, if all reasonable men must conclude that the evidence does not establish such case, then it is not substantial evidence." Further in the same case it was said: "While the jurors are the sole judges of the facts, the question as to whether or not there is substantial evidence in support of the plaintiff's case is always a question of law for the court, * * * and, in determining this question, 'the credulity of courts is not to be deemed commensurate with the facility and vehemence with which a witness swears.' " (*Casey* v. *Northern Pacific Ry. Co.,* supra.)

Applying these rules to the facts as disclosed by the evidence in the instant case, we are forced to the conclusion that Boepple could have seen the grader in ample time to have avoided the collision if he had been keeping a proper lookout ahead, in the manner admonished by law. (Compare section 1742 and section 1743 (amended by Laws 1927, Chap. 80, sec. 1), Rev. Codes 1921, and *Cowden* v. *Crippen*, ante, p. 187, 53 Pac. (2d) 98.)

Since the evidence shows conclusively that Boepple could have seen the grader at a distance of at least 239 feet if he had

been looking ahead as he should have done, he cannot now be heard to say that he did not see it. Under such circumstances, he is, in legal effect, in the position of having actually seen the grader at that distance. (*Autio* v. *Miller*, 92 Mont. 150, 11 Pac. (2d) 1039, 1043; *Johnson* v. *Herring*, 89 Mont. 420, 300 Pac. 535; *McNair* v. *Berger*, 92 Mont. 441, 15 Pac. (2d) 834; *Grant* v. *Chicago etc. Ry. Co.*, 78 Mont. 97, 252 Pac. 382.) In *Autio* v. *Miller*, supra, it was said: "The driver must look 'not only straight ahead, but laterally ahead.' * · * * Moreover, a person is presumed to see that which he could see by looking. * * * He will not be permitted to say that he did not see what he must have seen, had he looked. * * * The duty to keep a lookout includes the duty to see that which is in plain sight."

In the case of *Johnson* v. *Herring*, 89 Mont. 156, 295 Pac. 1100, 1104, it was said: "The duty to keep a lookout implies the duty to see what is in plain view, and the driver of an automobile is bound to operate his conveyance with reference, not only to the pedestrians and conditions he actually sees, but also as to those he should see in the exercise of reasonable care (Huddy on Automobiles, 8th ed., 448, and cases cited; *Morse* v. *Douglas* [107 Cal. App. 196, 198], 290 Pac. 465)." "He [a driver] could not escape the penalty of his negligence by saying that he did not see that which was in plain sight." (*Marsh* v. *Ayers*, 80 Mont. 401, 260 Pac. 702, 705.)

Obviously, the sole and proximate cause of the accident here was Boepple's failure to observe and comply with the above requirements, which the law imposes on him. For other cases wherein similar factual situations and legal principles were involved, see *Most* v. *Cedar County*, 126 Neb. 54, 252 N. W. 465; *Bruening* v. *Miller*, 57 S. D. 58, 230 N. W. 754, 758. (Compare *Simpson* v. *Miller*, 97 Mont. 328, 34 Pac. (2d) 528.)

Since, as we have pointed out, the proximate cause of the accident was Boepple's failure to keep a proper lookout, it follows that there is no merit or force in plaintiff's allegations of negligence with respect to defendant's failure to operate the

436

grader upon the right side of the road and his failure to use sufficient and adequate signs and warnings. Even if it were true that defendant was negligent in these particulars, still it is manifest from what we have said already that such negligence was not the proximate cause of the accident; hence such negligence, even if proved, could avail the plaintiff nothing. (*Stones* v. *Chicago etc. Ry. Co.*, 59 Mont. 342, 197 Pac. 252, 253; *Bruening* v. *Miller*, supra; *Albrecht* v. *Waterloo Const. Co.*, 218 Iowa, 1205, 257 N. W. 183; *Wilson* v. *Congdon*, 179 Wash. 400, 37 Pac. (2d) 892.) There was no causal connection between these alleged acts of negligence and the accident. (See *Geisen* v. *Luce*, 185 Minn. 479, 242 N. W. 8; *Powers* v. *Standard Oil Co.*, 98 N. J. L. 730, 119 Atl. 273.) As was said in the case of *Bruening* v. *Miller*, supra: "It is not necessary to discuss the question of failure to put up barriers or signs or the failure of defendants to notify plaintiff of the obstruction in the road which he could see."

The same is true with respect to the position of the grader upon the left side of the highway. It would have occupied the same space in the road had it been going west instead of east; and, from all that appears here, in that event Boepple would have collided with it just the same. The grader standing upon the left side of the highway did nothing more than "furnish a condition by which the injury by the subsequent independent act of a third person [Boepple] occurred. In such a case the existence of the condition is not the proximate cause of the injury." (*Bruening* v. *Miller*, supra; compare *Simons* v. *Jennings*, 100 Mont. 55, 46 Pac. (2d) 704, and *Simpson* v. *Miller*, supra.)

For the reasons above stated, we hold that the motion made by defendant Mohalt for an instructed verdict in his favor should have been granted. The judgment is reversed and the cause remanded, with direction to the district court to enter judgment in favor of the defendant.

ASSOCIATE JUSTICES MATTHEWS and MORRIS concur.

MR. CHIEF JUSTICE SANDS: I concur with the other Justices that the evidence in the record does not sustain the verdict that the defendant was guilty of negligence, but I cannot approve the order to make the verdict of this court final on the theory that the district court should have directed the jury to bring in a verdict for the defendant. The Seventh Amendment to the United States Constitution is as follows: ''In suits at common law, where the value in controversy shall exceed twenty dollars, the *right of trial by jury* shall be preserved, and no fact tried by a jury shall be *otherwise re-examined* in any Court of the United States, than according to the rules of the common law.'' Article III, section 23, of the State Constitution, is as follows: ''The right of trial by jury shall be secured to all and remain inviolate.'' With that provision in mind I fail to see how a judge can order a jury to disregard their own views of the testimony and bring in a verdict to conform to the views of the judge in such case. The right of trial by jury does not therefore ''remain inviolate.''

The district judge in this case heard the testimony and saw the witnesses while testifying and submitted the case to the jury. This court now finds a contrary verdict, and then says to the judge and jury: ''You're all wrong. The jury should have been ordered to bring in a verdict for the defendant. We now substitute our verdict for yours and render a judgment for the defendant that is final.'' (See sec. 9320, Rev. Codes 1921.) In this case it is not different than where a demurrer is submitted to the complaint. This is a demurrer to the evidence, and is sustained by the court. The law is universally accepted that, if a demurrer is sustained, the plaintiff has the right to amend his complaint and restate the facts, if he can do so, that his claimed rights may be tried. The failure to prove all the facts that perhaps could have been proved on the first trial where the judge and jury thought the evidence sufficient should warrant another trial. (Secs. 9054, 9320, Rev. Codes 1921.) Perhaps the evidence which caused the supreme court to reach its verdict would be overcome in a second trial. The verdict

of this court is unauthorized by the Constitution except perhaps as a negative factor. The plaintiff has not had a trial by jury if that jury is the supreme court. The order of the supreme court setting aside a jury verdict cannot under the Constitution go further than order a new trial. Furthermore, I cannot assent to a theory which permits a judge to order a jury of twelve men to disregard their own views of the facts and bring in a verdict directly contrary to their own opinion of the facts under the testimony. It is as if a judge should direct a jury of Catholics to bring in a verdict that the Protestant church is the only true religion. A directed verdict upon the facts (see sec. 9364, Rev. Codes 1921) is unwarranted and unconstitutional and an assumption of authority by courts.

In *Murray* v. *Hauser*, 21 Mont. 120, 53 Pac. 99, 101, the court said: ''But without a waiver of the right of trial by jury, by consent of parties, the court errs if it substitutes itself for the jury, and, passing upon the effect of the evidence, finds the facts involved in the issue, and renders judgment thereon. This is what was done in the present case. It may be that the conclusions of fact reached and stated by the court are correct, and, when properly ascertained, that they require such a judgment as was rendered. That is a question not before us. The plaintiff in error complains that he was entitled to have the evidence submitted to the jury, and to the benefit of such conclusions of fact as it might justifiably have drawn,—a right he demanded, and did not waive,—and that he has been deprived of it by the act of the court in entering a judgment against him on its own view of the evidence, without the intervention of a jury. In this particular we think error has been well assigned. The right of trial by jury in the courts of the United States is expressly secured by the seventh article of amendment to the constitution, and Congress has, by statute, provided for the trial of issues of fact in civil cases by the court without the intervention of a jury only when the parties waive their right to a jury by stipulation in writing. * * * This constitutional right this court has always guarded with jeal-

ousy.'' See, also, *Chessman* v. *Hale*, 31 Mont. 577, 79 Pac. 254, 256, 3 Ann. Cas. 1038, 68 L. R. A. 410, where this court said: ''If the right of trial by jury existed at the time of the adoption of the Constitution of the state, or of the seventh amendment to the United States Constitution, it still exists, and cannot be taken away by legislative enactment. It cannot become obsolete, for it is perpetuated by the state Constitution, and it continues so long as the constitutional provision continues. * * * The court, in considering the question as to the right of trial by jury, said: 'The seventh amendment, indeed, does not attempt to regulate matters of pleading or practice, or to determine in what way issues shall be formed by which questions of fact are to be submitted to a jury. Its aim is not to preserve mere matters of form and procedure, but substance of right. This requires that questions of fact in common-law actions shall be settled by a jury, and that the court shall not assume, directly or indirectly, to take from the jury or to itself such prerogative.' ''

Prior to the year 1921 the only way the supreme court could review the verdict of the jury was on appeal from the denial of a new trial in the district court (Chap. 225, sec. 12, Laws 1921). The only thing the supreme court could do in such appeal was to review the evidence, and, if in their opinion the evidence was insufficient to sustain the verdict, it could reverse the order on the motion for a new trial and direct the district court to allow the new trial—a vast difference from the present decision which in effect substitutes the verdict of the supreme court for that of the jury and makes it final. If this is not the violation of the long-cherished right of trial by jury, I do not know what it is. It is a violation of the long-accepted principle that the facts are decided by a jury and the law by the judge. Under this decision the verdict of the jury in effect becomes only advisory in spite of both national and state Constitutions. The people of England centuries ago wrung from King John the Magna Charta. The principle of the right of trial by jury of his peers is the most important principle reserved to the people

by that instrument of liberty for the people. We in this age need protection from constantly increasing usurpation of authority of—not King John—but the courts of America. I dissent most emphatically.

MR. JUSTICE ANDERSON, Concurring Specially: I concur with the majority opinion delivered by Mr. Justice STEWART. In the consideration and disposition of this cause, suggestions have been made, not, however, in the majority opinion, which challenge the correctness of certain fundamental principles of the law so long existent that they are deemed self-evident and, therefore, axiomatic. Long ago similar suggestions were made, but, after being the subject of argument and deliberation, were cast aside as unworthy of serious or further consideration. By the renewal of these ancient and discarded contentions, I am compelled to record here my views, in obedience to legislative command, as well as the views of many long gone before.

It is suggested that the power recognized for so many years in a trial court to grant, in a proper case, a motion to direct a trial jury to find a verdict, is violative of the Seventh Amendment of the Federal Constitution, and also section 23 of Article III of the State Constitution, in that the right of trial by jury guaranteed by these constitutional provisions is thereby unduly invaded. I shall first give consideration to the charge with relation to the Seventh Amendment to the Federal Constitution.

Mr. Chief Justice White, of the Supreme Court of the United States, speaking for the court in the case of *Minneapolis & St. Louis R. Co.* v. *Bombolis,* 241 U. S. 211, 36 Sup. Ct. 595, 596, 60 L. Ed. 961, said: "Two propositions as to the operation and effect of the 7th Amendment are as conclusively determined as is that concerning the nature and character of the jury required by that Amendment where applicable. (a) That the first ten Amendments, including, of course, the 7th, are not concerned with state action, and deal only with Federal action. We select from a multitude of cases those which we deem to be leading: *Barron* v. *Baltimore,* 7 Pet. 243, 8 L. Ed. 672; *Fox* v.

*Ohio,* 5 How. 410, 434, 12 L. Ed. 213, 223; *Twitchell* v. *Common-wealth of Pennsylvania,* 7 Wall. 321, 19 L. Ed. 223; *Brown* v. *New Jersey,* 175 U. S. 172, 174, 20 Sup. Ct. 77, 44 L. Ed. 119, 120; *Twining* v. *New Jersey,* 211 U. S. 78, 93, 29 Sup. Ct. 14, 53 L. Ed. 97, 103. And, as a necessary corollary, (b) that the 7th Amendment applies only to proceedings in courts of the United States, and does not in any manner whatever govern or regulate trials by jury in state courts, or the standards which must be applied concerning the same. (*Livingston* v. *Moore,* 7 Pet. 469, 552, 8 L. Ed. 751, 781; *Supreme Justices* v. *Murray,* 9 Wall. 274, 19 L. Ed. 658; *Edwards* v. *Elliott,* 21 Wall. 532, 22 L. Ed. 487; *Walker* v. *Sauvinet,* 92 U. S. 90, 23 L. Ed. 678; *Pearson* v. *Yewdall,* 95 U. S. 294, 24 L. Ed. 436.) So completely and conclusively have both of these principles been settled, so expressly have they been recognized without dissent or question almost from the beginning in the accepted interpretation of the Constitution, in the enactment of laws by Congress and proceedings in the federal courts, and by state Constitutions and state enactments and proceedings in the state courts, that it is true to say that to concede that they are open to contention would be to grant that nothing whatever had been settled as to the power of state and federal governments or the authority of state and federal courts and their mode of procedure from the beginning. Doubtless it was this view of the contention which led the supreme court of Minnesota in this case and the courts of last resort of the other states in the cases which were argued with this to coincide in opinion as to the entire want of foundation for the proposition relied upon, and in the conclusion that to advance it was virtually to attempt to question the entire course of judicial ruling and legislative practice, both state and national, which had prevailed from the commencement.''

Likewise, in the case of *Walker* v. *Sauvinet,* supra, Mr. Chief Justice White declared: ''By Art. 7 of the amendments, it is provided, that 'in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by

jury shall be preserved.' This, as has been many times decided, relates only to trials in the courts of the United States. (*Edwards* v. *Elliott*, 21 Wall. 532, 557 [22 L. Ed. 487].) The states, so far as this amendment is concerned, are left to regulate trials in their own courts in their own way. A trial by jury in suits at common law pending in the state courts is not, therefore, a privilege or immunity of national citizenship, which the states are forbidden by the Fourteenth Amendment to abridge.''

It is thus apparent that the Seventh Amendment to the Federal Constitution is without application to proceedings in state courts.

Let us pause, however, to observe what the Supreme Court of the United States has said with reference to the meaning of the phrase ''trial by jury,'' as used in the American Constitutions. In the case of *Capital Traction Co.* v. *Hof*, 174 U. S. 1, 19 Sup. Ct. 580, 585, 43 L. Ed. 873, it was written: '' 'Trial by jury,' in the primary and usual sense of the term at the common law and in the American Constitutions, is not merely a trial by a jury of 12 men before an officer vested with authority to cause them to be summoned and impaneled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of 12 men in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict, if, in his opinion, it is against the law or the evidence. This proposition has been so generally admitted, and so seldom contested, that there has been little occasion for its distinct assertion. Yet there are unequivocal statements of it to be found in the books.'' This statement received the unqualified approval of the United States Supreme Court in the case of *Patton* v. *United States*, 281 U. S. 276, 50 Sup. Ct. 253, 74 L. Ed. 854, 70 A. L. R. 263.

The meaning of section 23 of Article III of the State Constitution has frequently been the subject of judicial investigation by this court. In the case of *State ex rel. Jackson* v. *Kennie*,

24 Mont. 45, 60 Pac. 589, 593, this court said, speaking through Mr. Chief Justice Brantly: "In this contention, however, counsel overlooks one of the fundamental rules of constitutional construction on this subject, viz., that this instrument must be construed in view of the conditions existing at the time of its adoption, and that the right of trial by jury guaranteed under this broad declaration is the right as it then existed, and not one created or extended, except by express terms, by the instrument itself. This rule extends to both civil and criminal trials, and is applied by the courts to the constitutions of all our states." The doctrine there announced has been adhered to in an unbroken line of decisions, among which are the following: *Montana Ore Purchasing Co.* v. *Boston & Montana etc. Co.*, 27 Mont. 288, 306, 70 Pac. 1114; *Chessman* v. *Hale*, 31 Mont. 577, 79 Pac. 254, 3 Ann. Cas. 1038, 68 L. R. A. 410; *Consolidated etc. Min. Co.* v. *Struthers*, 41 Mont. 565, 571, 111 Pac. 152, 156; *Cunningham* v. *Northwestern Improvement Co.*, 44 Mont. 180, 215, 119 Pac. 554; *Davidson* v. *Davidson*, 52 Mont. 441, 158 Pac. 680; *In re Valley Center Drain District*, 64 Mont. 545, 551, 211 Pac. 218; *Bull* v. *Butte Electric Ry. Co.*, 69 Mont. 529, 532, 223 Pac. 514.

In the case of *Consolidated etc. Min. Co.* v. *Struthers*, supra, the same contention was there made as is here suggested, and it was there written: "Under section 250, div. 1, Comp. St. 1887, the parties were entitled to a trial by jury of the issues of fact in actions for the recovery of real property; and this is to say that, whenever in a given case the evidence is such that reasonable men may disagree as to the proper inference to be drawn from it, it must have been submitted to the jury. The jury, and not the court, must weigh and decide. But it has always been the practice in this jurisdiction that, when the evidence on the part of the plaintiff does not tend to establish the cause of action stated in the complaint, the court may direct a verdict."

Section 9364, Revised Codes 1921, declares as follows: "Where, upon the trial of an issue by a jury, the case presents

only questions of law, the judge may direct the jury to render a verdict in favor of the party entitled thereto." It is noteworthy that the quotation supra, from the case of *Consolidated etc. Min. Co. v. Struthers*, was first published to the world on October 3, 1910. Since that day the duly elected representatives of the sovereign people of this state have met in regular biennial session no fewer than twelve times to enact laws for their government. Following many decisions of this court interpreting the law, if a succeeding session of the legislature has not found the result there declared to be, in its wisdom, in accord with its views, it has at an early date proceeded to amend or change the existing law. As illustrative of this legislative power to act, this court on January 22, 1935, in the case of *State* v. *Wiles*, 98 Mont. 577, 41 Pac. (2d) 8, decided that district courts had no original jurisdiction over violations of the provisions of Chapter 105, Laws 1933. The legislature, being then in session, at once enacted Chapter 166, Laws 1935, conferring original jurisdiction on district courts in the class of cases in question. But section 9364, supra, first enacted in 1895, has remained unchanged through all the sessions of the legislature. It follows that this enactment and the pronouncement of this court in 1910 must be in accord with the will of the people; otherwise legislative action would have been the result in an effort to create a change in the existing law.

This court has frequently said that a motion for a directed verdict is in effect a demurrer to the evidence. (*McIntyre* v. *Northern Pacific Ry. Co.*, 56 Mont. 43, 180 Pac. 971; *Barrett* v. *Shipley*, 63 Mont. 152, 206 Pac. 430; *Wagner* v. *Donald*, 67 Mont. 114, 117, 214 Pac. 1099; *Long* v. *Davis*, 68 Mont. 85, 88, 217 Pac. 667.)

It is suggested that the right, or the assertion of the right, of a court to direct a verdict by the jury for the want of any evidence to raise an issue of fact, is one of comparatively recent origin. As we have already observed, and as this court has said, a motion for a directed verdict is in legal effect nothing more than a demurrer to the evidence. Let us therefore turn

to some of the older authorities and see if there was any justification in the common law for such procedure. We find Sir William Blackstone in his Commentaries, compiled and written long before the adoption of either the Federal or State Constitution, commenting with reference to a demurrer to the evidence. He says of the effect of the demurrer that it admits the truth of every fact proof of which has been introduced, but denies the sufficiency of them all in point of law to maintain or overthrow the issue, and that it "withdraws the question of law from the cognizance of the jury to be decided (as it ought) by the court." (2 Cooley's Blackstone, p. 1134.) A multitude of authorities could be cited in support of this view; let us consider one or two.

In the case of *Cole* v. *Hebb*, 7 Gill & J. (Md.) 20, written more than a century ago, it was said of motions for directed verdicts: " 'Wherever the testimony, adduced by a plaintiff, is so light and inconclusive, that no rational well-constructed mind can infer from it the fact which it is offered to establish, it is the duty of the court when applied to for that purpose, to instruct the jury, that there is no evidence before them to warrant their finding the fact thus attempted to be proved. Such is the doctrine, sanctioned by long practice, and judicial determinations, as well in this state as in Great Britain, and the expediency, and wisdom of the principle is too obvious to be questioned.' * * * The decisions of courts of law, the language they use in determining on general prayers made to them, that the plaintiff is not entitled to recover, or that the evidence offered is not sufficient to entitle him to a verdict, from the earliest age of our judicial history down to the present day demonstrate the position, that evidence offered to a jury in the trial of a cause, has a two-fold sufficiency; a sufficiency in law, and a sufficiency in fact. Of its sufficiency in law the court[s], when applied to for that purpose, are the exclusive judges; its sufficiency in fact is a question exclusively cognizable by the jury. When the courts are called on to instruct the jury as to the sufficiency of the evidence offered to sustain the issue,

446

or to establish any particular fact material to its determination, it is the province of the court to determine on 'the measure and quantity of proof,' it is a question of law, and not of fact. * * * If the courts are incompetent to measure and weigh testimony, how is it that they are almost daily called on to instruct the jury that the evidence offered is not sufficient to entitle the plaintiff to recover? The application to the court is not to instruct the jury that the plaintiff has offered no evidence to sustain the issue on his part, and therefore is not entitled to a verdict; but that the evidence offered is not sufficient for that purpose. It would be a solecism to ask the court's instruction that the evidence is not sufficient where no evidence whatever had been adduced. * * * Nor is it, as has on some occasions been contended, any infringement of that sage axiom of common law, 'ad questiones juris respondent judices, ad questiones facti respondent juratores:' it is coeval with the institution of the trial by jury; is the balance wheel of the machine by which their powers are exerted, a check, a safeguard placed around them to prevent the abuse, not the use of their authority. It is in fact, both in practice and theory, the great conservative principle of our jurisprudence, as respects the trial by jury. Constituted as courts of justice are under our political institutions, where all powers, rewards and punishments flow directly or indirectly from the people: all accountability is to them; there is not the slightest ground for the apprehension, that in the exercise of the power claimed for the court, the salutary rights of the jury will be endangered by judicial encroachments. * * * Neither is this wholesome common law maxim, as to the respective rights of court and jury, more alarmingly infringed upon, by the exercise of the power of instruction as to the legal sufficiency of evidence, than it is by the court's exertion of the undeniable right to set aside verdicts, and grant new trials. In the latter case the court not merely determine[s] on the legal sufficiency of the evidence, but judge[s] of its measure and quantity as regards its sufficiency in fact, and from their decision there is no appeal to a higher

or more enlightened tribunal. In the former case the court[s] never withdraw the testimony from the consideration of the jury, but where they would instantaneously set aside any verdict founded on its assumed sufficiency. Where the reason, justice, or policy under such circumstances, of leaving the parties litigant to a continued fruitless controversy before the jury, and subjecting them to an expensive, onerous and unavailable new trial before another jury?''

From the foregoing authorities it is apparent that motions for a directed verdict, or their equivalent, were known to the law long before the adoption of our Constitution; and, as it has been said by this court in decisions cited supra, the right of trial by jury guaranteed by our Constitution is only the right which was known and recognized at the time of its adoption. Since motions for directed verdicts were recognized long before the adoption of our Constitution, it cannot be said that the court by the exercise of this right is thereby invading, in a proper case, the province of the jury or arrogating unto itself a new and unfounded authority.

In passing, I observe that in some states attempts have been made by legislative enactments to deprive trial courts of this power under Constitutions not unlike our own, and in every instance such an Act has been held to be an undue invasion of the powers delegated by the Constitution to the judiciary. (*Thoe* v. *Chicago etc. Ry. Co.,* 181 Wis. 456, 195 N. W. 407, 29 A. L. R. 1280; *Bielecki* v. *United Trucking Service,* 247 Mich. 661, 226 N. W. 675; *People* v. *McMurchy,* 249 Mich. 147, 228 N. W. 723.) I merely make mention of these decisions and their result, but refrain from expressing an opinion as to the soundness of their conclusions. The legislature has said that the trial court may direct a jury to render a verdict in favor of the party entitled thereto when only questions of law are presented. (Sec. 9364, supra.)

The Constitution, section 3, Article VIII, provides as to this court: ''The appellate jurisdiction of the supreme court shall extend to all cases at law and in equity, subject, however, to

such limitations and regulations as may be prescribed by law." Section 8805, Revised Codes 1921, provides: "The supreme court may affirm, reverse or modify any judgment or order appealed from, and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had."

It is suggested that prior to the year 1921 the only method for a review by this court of the verdict of a jury was an appeal from a denial of a motion for a new trial, and such I concede the state of the law prior to that time. In 1921 the legislature enacted what became section 9745 of the Revised Codes of 1921, which provided: "Appeals from orders overruling the motion for a new trial are hereby abolished, and all questions heretofore raised on such an appeal may be raised on an appeal from the judgment"; and in 1929, by Chapter 87 of the Laws of that year that section was further amended by adding thereto this additional provision immediately following the sentence just quoted, "such questions may be raised and reviewed regardless of whether or not motion for new trial has been made in the trial court."

In the case of Benema v. Union Central Life Ins. Co., 94 Mont. 138, 21 Pac. (2d) 69, 70, this court, speaking through Mr. Justice Angstman, said: "Plaintiff's position is that, in view of the facts here, Judge Elwell had lost jurisdiction over the motion for new trial and that in consequence the case stands as if no motion for new trial had been made, thus entailing the consequence pointed out in Hanlon v. Manger, 85 Mont. 31, 277 Pac. 433. But that case was decided before the effective date of Chapter 87, Laws of 1929, which permits a review of all questions on an appeal from the judgment which, before the enactment of section 9745, Revised Codes 1921, which Chapter 87 amended, could have been raised on an appeal from the order overruling the motion for a new trial. And Chapter 87 specifically provides that 'such questions may be raised and reviewed regardless of whether or not motion for new trial has been made in the trial court.' Hence, if the case stood as if no motion for

new trial had been made, it would not be ruled by the case of *Hanlon* v. *Manger*, supra, but by Chapter 87, Laws of 1929, which, since no other time was specified for its taking effect, became effective July 1, 1929 (sec. 90, Rev. Codes 1921), after the decision in the *Hanlon Case*."

In the case of *Mills* v. *State Board of Equalization*, 97 Mont. 13, 33 Pac. (2d) 563, 568, it was said of the powers and duties of courts: "The judicial tribunals of the state have no concern with the policy of legislation. That is a matter resting altogether within the discretion of another coordinate branch of the government. The judicial power cannot legitimately question the policy, or refuse to sanction the provisions, of any law, not inconsistent with the fundamental law of the state."

That portion of our written Constitution commonly denominated the "Bill of Rights" was devised and promulgated to protect the individual rights of minorities, and to prevent minorities chancing momentarily to be in power from thwarting the will of the majority, and to prevent the tyrannical exercise of power. Its principles were, in the main, first collected in the Magna Charta.

Section 1 of Article XIX of our Constitution provides the form of oath administered to all officers of the state, and unto which all are required to subscribe: that they will support, protect, and defend the Constitution of the state of Montana and discharge the duties of the office with fidelity. The legislature has spoken. It has said that it is the duty of trial courts, in proper cases, to grant a motion for a directed verdict. If that statute is thought not to express a sound and wise principle of law, the people, by the legislature, have the power to repeal the statute; and, if the people find that their duly elected representatives are not in accord with their views on this subject, the power of initiative, preserved in the Constitution to them, may be exercised at their command to obtain the same result; and, if it is found necessary, in order to prevent the exercise of this power by courts, that a constitutional amendment is required, if such an amendment would be wise and expedient,

appropriate machinery is found in the Constitution to accomplish that purpose. The will of the people as expressed in their Constitution is supreme. They are free to change it at any time, so long as it does not infringe on the powers which they have delegated to the national government, and which are incorporated in the national Constitution. Until such time as the legislature has changed the existing laws, or the people in the exercise of their sovereign power have amended the Constitution—whether I approve of the principle expressed by the written law or not—I feel it my duty to enforce it as written. If the time arrives when to follow it as so written becomes obnoxious to me, I shall then feel it my duty to step aside and permit someone who can conscientiously uphold the law as written to assume my duties.

Rehearing denied March 4, 1936.