VIRGIL W. BOSTWICK, by his Guardian, GERALD H. BOSTWICK, Plaintiff and Appellant, v. BUTTE MOTOR COMPANY, a Corporation, Defendant and Respondent.

No. 10752.
Submitted March 9, 1965. Decided June 21, 1965.
As Amended July 8, 1965.
403 P.2d 614.

M. J. Doepker (argued), Doepker & Hennessey, Frank Burgess (argued), Butte, for appellant.

Robert A. Poore (argued), Poore, Poore & McKenzie, Butte, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal from a judgment in favor of defendant, Butte Motor Company, hereinafter referred to as respondent, resulting from a jury trial in the second judicial district of the State of Montana, in and for the County of Silver Bow.

The facts of this case tell of an accident to an outstanding seventeen-year old boy who was burned by hot radiator coolant as he was working his way out from under the front end of a car which he had been attempting to repair. The young man suffered grievous bodily injury from second and third degree burns to his stomach, groin and legs, which will disfigure and cause him discomfort his entire lifetime. It is natural to feel great compassion for him, and we are certain that both the court and jury did have as they heard the testimony concerning the injuries he suffered, but we must, as did the lower court, search for the liability, if any.

The facts surrounding the injury to Virgil Bostwick revolve around a 1958 Ford Country Sedan. The car had originally been purchased by a company operated by Gerald Bostwick, Virgil Bostwick's father, but because of financial problems the

car was returned to the respondent. Mr. Bostwick then arranged with the respondent to purchase the car for the family inasmuch as it was a good car, and in January 1961, he requested the respondent to go over the car thoroughly and to find what was needed to be done and to fix it. The Bostwicks made a $100 down payment in February 1961 to hold the car, took delivery from respondent on May 11, 1961, and drove it to Dillon, Montana, some 67 miles. The next day he drove it to Monida, Montana, and when he started to return the car would not start. Upon opening the hood he found the motor oily and the starter loose, which he tightened. He then put in four quarts of oil, and drove it back to Dillon and then to Butte on May 15, to get the respondent to fix the car. Bostwick returned the car to Dillon on May 17, but again due to the fact it used oil it was returned to Butte and on May 30, 1961, Gerald Bostwick engaged the services of the Butte Motor Company to overhaul the car in question. He ordered overhaul of the motor, cooling system, starter and transmission, including replacement of piston rings and parts, and ordered the respondent to put the car in A-1 shape. The car was completely overhauled by respondent and after the overhaul the car was road-checked some twenty miles, by one of respondent's mechanics. The car was then checked out as mechanically ready for its owner. On June 16, in Butte, the appellant took delivery of the car and drove it back to Dillon. During the next two days it was driven by the family in and around the City of Dillon with no mechanical difficulties appearing.

On the morning of June 18, 1961, Gerald Bostwick turned the car over to his son Virgil to drive it to Idaho Falls, Idaho, on business for him. Virgil took his thirteen-year old brother Theodore with him for company, and also for help as the car was pulling a two-wheel U-haul trailer behind it containing a service station sign which was to be delivered at Monida, Montana. During the trip from Dillon to Monida, some forty miles, both boys testified that the car drove well, that there

was no undue heating even though they were pulling a trailer with a 1,700-pound load. Leaving Monida they proceeded up over the Monida Pass into Idaho, the rise in altitude from Dillon to the top of Monida Pass being 1,417 feet in a distance of 65 miles. Though there is a fairly steady rise in altitude on this road, both boys testified that the car did not heat up nor did they experience any car trouble until they were about twelve miles north of Idaho Falls when they heard noises in the car like rocks in the hubcap. They stopped, checked the car, the trailer, its connecting chain, and the tanks in the trailer, but finding nothing wrong, started up again. After driving a short distance the noise became louder so Virgil drove the car off the side of the road allowing the wheels to straddle a V-shaped ditch. At this time, before stopping the motor, the car had not shown any undue heating. Rather, the heat indicator showed normal at the time the car was stopped the second time.

According to the story told by both boys, Virgil lifted the hood, and as he did so, Teddy testified he heard Virgil say, "I hope it isn't the starter." Virgil then put on what is described as a smock and crawled under the car, starting at the rear and moving toward the front. Teddy handed him tools and after working for about five minutes Virgil called Teddy, who was seated in the car, and asked him to take the tools and put them back into the car. Shortly after accomplishing this task and getting seated in the front seat Teddy heard his brother scream and when he got out of the car his brother stood up, in front of the car, his clothes wet and the visible portions of his body, except the head and neck, showed evidence of burns. Virgil was in great pain, they removed the smock and the two boys then walked to a nearby farm house belonging to the T. R. David family. There the Davids administered first aid and obtained an ambulance to move Virgil to a hospital in Idaho Falls where he was treated for several months by Dr. C. C. Erickson.

From the time of the accident to the time of the trial, Virgil had medical treatment from both Dr. Erickson and Dr. Richard H. McLaren, Dillon, Montana, the family physician. Both doctors testified at length as to the injuries, the scarring and deformities that resulted therefrom, the necessity to do skin grafting, and the development of phlebitis in the left leg. In addition to their medical testimony, Virgil, at the request of the defendant, went to Dr. J. C. Shields of Butte for a medical examination who confirmed all of the testimony of the other two doctors but did not entirely agree on Virgil's prognosis as made by Drs. Erickson and McLaren.

Virgil testified that he had to get under the car to fix the starter, which had come loose. Concerning what he did and what happened while under the car, Virgil testified as follows:

"Q. And what was the first thing that you did, then, after you stopped the automobile in regard to getting out and investigating? A. Well, I got out of the car and I opened up the hood and I looked around there; and it appeared to me that maybe the starter could have been loose because I had heard a buzz from the starter when I started it up, and it sounded like there was a hum to it as I was driving down the road, and it could have been the switch sticking or the starter sticking, so I closed the hood back down, * * * and you see you have this little swale like that gives you plenty of room to crawl underneath the right side; and so you figure if this is going to be, that's the safest way to do it, so you go about doing it in that manner.

"Q. All right; then after you had stopped and lifted up the radiator—or I mean, lifted up the hood as you describe, what then did you do towards looking about to determine what the trouble was? A. Well, I put on this smock, is what I imagine you would call it, it's like a bathrobe except out of canvas-like material with Safeway Meat Packing on the back of it, I put this on, it extended down to about the knees, and I tied it, and when I first looked underneath of the the back end, it looked

sort of spooky to me, actually I was scared to even crawl underneath of it, but I figured in order for me to check it out or determine what the noise was, I've got to crawl under there to see, anyway; so I crawled under the car from the back.

"Q. All right; where did you start your crawling under the car from? A. From the back. It was mostly—I started from the left-hand side, more on the left-hand side than, on the back.

"Q. More on the left-hand side to start and then on the right? A. Yes, and then I crawled over to the right.

"Q. And then you got finally on the right-hand side of the automobile, did you? A. Yes.

"Q. And then what inspection did you make to determine what the trouble was? A. Well, after I got up past the—oh, a couple of feet past the rear axle, I asked my little brother to hand me the tools, and I was looking back like that (demonstrating) to see where I was going, to more or less determine where I was going, and, anyway, it could have been the rear end, but I didn't know anything about rear ends, monkeying with them, so I just decided that, I just thought I'd check out the starter, so I asked my little brother to hand me the tools, and he handed me the sack of tools and I crawled up on my back up to that starter.

"Q. And which way were you headed, head first or feet first? A. Head first.

"Q. And at that point are you altogether on the right-hand side underneath the car, is that right? A. Yes.

"Q. All right; now, then, when you got to the starter what did you discover? A. I discovered that it was loose.

"Q. To what extent was it loose? A. It wasn't real loose, but it was loose enough, I mean it was like—I couldn't say to what—that it was real loose, but it was loose.

"Q. Well, was it loose on the three bolts or two of them or what is your memory of it? A. Well, as I can remember I tightened it up, but there was a couple or one maybe that was looser than the rest of 'em, and one was a little tight, what I

mean is that it wasn't tight, but it was loose, but some of them were just a little looser than the other.

"Q. All right, now, you had the wrenches with you, did you? A. Yes.

"Q. And what did you do? A. I proceeded to tighten up the starter—these, I think they call them tap screws or tap bolts or whatever they are called.

"Q. And then did you use one of the wrenches to tighten them? A. Yes.

"Q. And finally, then, did you get the starter snugged up or tightened? A. Yes.

"Q. Now, then, during this time that you have been testifying to here, that you were examining under the hood and your examination of the automobile when it was astraddle of that little borrow pit there, and getting under the car, and starting and tightening the starter, could you give us an estimate of the time that you think was consumed in that, how many minutes? A. Up to that point, I would say about—

"Q. From the time you got stopped until you got under there and tightened the starter? A. Oh, about six or seven minutes up to the time I tightened the starter.

"Q. Six or seven minutes? A. Yes, or seven or eight.

"Q. All right; now, then, after you had tightened up the starter what did you do with the tools? A. I threw them out or tossed them out to the right side of the car.

"Q. In other words, did you still continue to be on the right side of the car? A. Yes.

"Q. And after you finished tightening the starter, what next did you do? A. I started to crawl on my shoulder blades to crawl out, and as I started to do this there was a sudden shock —the radiator hose—it scared me and I screamed a couple of times.

"Q. Well, what caused you to scream? A. It was hot.

"Q. You mean one radiator hose or something let loose and sprayed water on you, is that it? A. Yes.

"Q. And where did the water come from, if you remember? A. From that point where I was at all that I could say was that it was coming from the right side of the—the right side of me, which would be the left side of the car.

"Q. All right; now, how far do you think you had gotten out from under that car when that water hit you? A. Well, I would say that my waist—my belt line of my waist would have been some place around the fender—where the fender comes down more or less about where your feet are when you are sitting in the car—someplace in there.

"Q. Now, then, Virgil, as this water came down and struck you, what did you next do? A. Well, it was too hot for me under there so I tried to get out of there as fast as I could, and I thought I was far enough ahead to reach up and grab ahold of the bumper, but my arm didn't reach that far, it lacked a couple of feet from there, and so I had to keep on crawling on my shoulder blades until I reached the point where I could grab ahold of the bumper to pull myself out.

"Q. Now, is that the only part of the automobile that you took hold of, that bumper? A. That's the only part I touched—

"Q. In getting out? A. —besides the starter.

"Q. Beg pardon? A . That's the only part I touched besides the starter.

"Q. I see; so that, then, from your description, I assume you came out from the front, is that right? A. Yes.

"Q. And which way—head first or feet first? A. Head first."

On cross-examination Virgil testified concerning his activities under the car as follows:

"Q. You could see under there, all right; what else did you check beside the differential? A. Well, I just looked around at it, and it didn't appear to me that anything was wrong with it, so I just crawled on up.

"Q. Now, when you got there to the starter, apparently you

—well, you tell me—did you feel around and find that some of the studs were loose, is that it, Virgil? A. Yes, and I crawled up on my shoulder blades to the starter. The starter would be from about here (indicating) up—about from here (indicating) up, the starter would be. * * *

"Q. All right; you indicated that the starter would be right above your necktie, was it— A. Yes.

"Q. —or right above your chest? A. Yes.

"Q. O. K., go ahead, Virgil? A. And I felt up there and found that those tap screws, or whatever they are called, were loose.

"Q. Now, you have said, if I've got your testimony right, some of them were looser than others? A. Yes, a little looser than others.

"Q. All of them were there—there were three of them there? A. Yes, they were all there.

"Q. They were all screwed in more or less? A. Yes.

"Q. None of them—well, you said they were all there— O. K.; now, were some of them flush up against the housing? A. No.

"Q. Sir? A. No.

"Q. Well, describe to the Jury please what did you see or feel about those tap screws where they were? A. They were just loose. They were—I didn't take the time to look at it real close or—it was kind of greasy under there, and the oil pan is over there, I didn't want to touch it or touch anything that was real greasy; I just—I would just feel around and feel that the heads were loose, and if the heads were loose, why, you can tighten them up.

"Q. Did you tighten them up? A. No, well, I turned it just as much as I could with my hands, the ones that I could get at.

"Q. And then is that when your little brother had given you the tools already or what is the fact? A. He handed me the tools when I was in the back.

"Q. I see, you had them as you went— A. Yes.

"Q. —inching your way up? And then you tightened those up? A. Yes.

"Q. And what tool did you use, Virgil? A. It was an open-end wrench.

"Q. Could you describe it to the Jury, please? A. It has— could I draw a picture of it?

"Q. Sure, you betcha. A. I don't know how you describe it.

"Q. Here is a pencil and I will get you a clean sheet of paper. * * *

"Q. (After examining paper handed to him by the witness) Oh, yes, a regular open-end wrench, is that right. A. Yes.

"Q. It is a good drawing, Virgil—. * * *

"Q. Now, you have drawn, on what has been marked as Defendant's Exhibit D for identification and it is quite good, what looks like a wrench; now, would you tell me: Is that to scale or is that much smaller than the true scale? A. This is much smaller.

"Q. About how long would that wrench truly have been? A. I can't remember. It was about six or eight inches, I think, or less.

"Q. Six or what, sir? A. Six inches, or less.

"Q. About six inches long, you don't remember, of course, whether it was a half inch or three-quarters? A. No, I don't remember.

"Q. Thank you very much Virgil— A. I reached in the bag and pulled out a wrench and that fitted on there, and it was sort of a hunt and peck system.

"Mr. R. A. Poore: Sure, We offer in evidence. * * *

"Q. (By Mr. R. A. Poore) All right, Virgil, when you tightened those cap screws—I think the experts have been calling them—you tightened those up, and you said there were three of them? A. Yes."

Respondent in the submission of its case went to great lengths to convince the jury, with expert witness testimony,

that it was impossible for Virgil to perform the tightening of the starter with an open-end wrench as he testified to on direct examination.

While on the stand during the cross-rebuttal Virgil gave additional testimony on what he did. His testimony is as follows:

"Q. All right, now Virgil, show us also now how you did it just with your fingers, the way you testified? A. Well, I tightened up that—now, sir, do you remember correctly that you asked me if I tightened them up with my fingers—and I said—let's see, what did I say—what I could, and I didn't say I tightened every one of them up. I just said that I tightened some up. What I could get at.

"Q. I thought you tightened every one with your fingers, Virgil? A. I didn't say that.

"Q. You didn't say that; now, at least, you did not tighten them all with your fingers? A. No, I didn't say I did, either.

"Q. Now, when I asked you how you tightened the bolts, I don't remember your telling me about the screw driver? A. You never asked me.

"Q. Well, I asked you how you tightened them, didn't I? A. I said with a wrench, yes.

"Q. Now, did you say a six-inch wrench, Virgil? A. Yes, I said it was approximately. I didn't know the size.

"Q. What would you say the length of the wrench is, Virgil (indicating wrench in witness's hand)? A. They are about eight to ten inches.

"Q. Ten inches? Has anybody got a ruler there? A. About eight to ten inches.

"MR. POORE: Frank, is there a ruler there? A. Of course, you see, as I told you before I didn't measure it before; now, I may measure it off like this (demonstrating)—that there is about six inches on my hand. I imagine this is about four (indicating).

"Q. Well, would you, I would agree it is about ten inches,

Virgil, is that what you feel this wrench is—about ten inches long? A. I would have to measure it off with the back of my hand.

"Q. Now during the time you were tightening these bolts, did you have any difficulty at all with the manifold? A. I can't—not that I can recall—I can't recall any. I can't recall whether I had any or not.

"Q. Now, Virgil, would you illustrate to the Jury again how you kept the head of that wrench on this bolt, which, as I understand it, was up above your head, and you were lying on the ground? A. Yes.

"Q. All right! I don't want to ask you to lie on the ground— A. Well, I can— * * *

"Q. —you just stay where you are; now, this was above your head and you were faced this way (demonstrating), and this is the back of the car (indicating), back where I usually sit, now, will you show us how you did it? A. I just reached up and more than likely feel around there (demonstrating).

"Q. Feel around? A. Yes, feel around.

"Q. And you feel around until you get it so it fits on the head? A. Yes.

"Q. All right; and then what do you do? A. You make sure you have got it on the head—

"Q. Well, let's see you make sure you've got it on the head? A. Well, there is no nut there.

"Q. In the general area, then? All right. Now, what do you do? A. You just sort of hold it—there's no nut on there so—

"Q. No, that's right? A. You hold that like that, and you turn it, and each time you can only turn it so far (demonstrating), then you have to take it off (demonstrating) and reset it (demonstrating) and put this back in and turn it (demonstrating).

"Q. And each time you turn it so far then you take hold of this wrench out, put it back in, find the sides where it will fit

and then give another turn? A. Well, slip it off close to the area of where it's at.

"Q. Virgil, when I asked you how you did that, don't you agree that that's an unusual and elaborate way to have done this repair job? A. Well, I didn't have any professional tools to get into this to do it.

"Q. Right— A. And so I had to work with what I had.

"Q. Virgil, when I asked you on direct examination at the beginning of this how you tightened the bolts, was there any question about your understanding me? You said you tightened them first with your fingers and then with a six-inch open-end wrench, was there a misunderstanding of what I was asking you? A. Well, you just asked me how I tightened them, and I gave you a general idea of it.

"Q. Don't you think that with this combination to make a special tool that the Jury and Court was entitled to that initially? A. Well, you didn't make any point of it.

"Q. And, of course, in describing the tool that was used, you didn't indicate a screw driver, Virgil. A. No.

"MR. POORE: Nothing further.

"MR. DOEPKER: You may step down, I have nothing further."

The appellant's prime contention is that in the overhaul of the car by the respondent it negligently installed a defective head gasket. That this negligent installation was what caused the internal force that exploded the lower radiator hose just when he was getting out from under the car. Throughout the testimony introduced by appellant is a denial that Virgil ever touched or pulled on the hose as he was trying to get out from under the car. Appellant introduced the hose in question which showed a cross section break of the hose.

The respondent's case introduced considerable demonstrative evidence, as well as expert testimony, to show that the accident could not have happened as was testified to and going to prove that it was an external force rather than an internal force that

ruptured the hose. Expert testimony was given to prove that the work done by respondent's mechanics was not negligently done nor did said work cause the injury to Virgil. Eugene Abolnczy, an auto mechanic with over sixteen years of experience and who performed the overhaul of the car, testified both as an adverse witness and later for the defendant that the overhaul job had been performed exactly as directed in the 1958 Ford car shop manual. A 1958 motor, exactly like that in the car in question, was set up before the jury. He testified that when the overhaul was complete he drove the car for some twenty miles up a steep hill, and that after the road test a careful inspection showed that the job had been properly done. To a hypothetical question put to him containing the facts testified to by Virgil, Mr. Ablonczy stated that in his opinion, based on reasonable mechanic's certainty, that with everything normal it took some "outside influence" rather than "internal influence" to cause the lower radiator hose to break.

Another expert witness for the defense was Koehler Stout, an Associate Professor of Engineering at the Montana School of Mines. Not only was he an ordinance mechanic during the War but his father was a mechanic and he did his own repair work on his autos. In addition, he had studied the principles of motors, thermodynamics, hydraulics of materials, but at the time of the trial he was teaching mechanics and thermodynamics at the School of Mines. He testified at length about motors, their cooling systems, the heat developed by an automobile motor, the operation of thermostats, the pressures within an engine and what would happen and when it would happen, to a motor when a head gasket was improperly put on. According to Mr. Stout the motor would miss within a few miles, and would cause engine malfunction. When asked the same hypothetical question asked of Mr. Ablonczy, as to whether or not an internal or external force ruptured the lower hose, Mr. Stout replied as follows:

"A. Well, on June 19th, with everything indicating normal

I would say that some external force caused that hose to break.

"Q. (By Mr. Roth) Now, Mr. Stout, why would you consider an external force necessary to make that hose break on June 19, 1961? A. Because everything was normal. As I understand it, the engine was operating within a normal temperature range, with no evidence of overheating, no smelling or anything like that, and an engine is designed to withstand normal conditions, the hoses, the radiator and the whole system.

"Q. That includes the radiator hoses, does it, Koehler? A. Yes.

"Q. And I might add that in the hypothetical case it has been indicated that the hose that allegedly broke on June 19, 1961, is a normal, non-defective radiator hose; now, assume, Koehler, that excessive heat had built up in the system, what would the excessive heat cause? A. First off, it would cause a rise in the temperature indicator; and secondly, the safety cap or pressure cap should have released and allowed the gases to escape through the overflow pipe.

"Q. Do you know what pressure a 1958 Ford Country Sedan automobile, such as we have been talking about, is designed to operate under, that is, the cooling system? A. According to the manual, fifteen pounds per square inch above the atmospheric pressure.

"Q. And are the hoses designed to withstand pressure in excess of fifteen pounds? A. Yes.

"Q. And if pressures in excess of fifteen pounds were in the system, would the system be operating and be operating normally? A. Not in excess of fifteen pounds; the overflow pipe —or the pressure cap would be releasing, and the pressure would be released through the overflow pipe.

"Q. Now, if sufficient exhaust gases had been getting into the systems cooling to cause the rupture of a radiator hose, would this heat evidence itself at any time prior to the time

that the car was stopped? A. Yes, it should, on the heat indicator.

"Q. Would the movement of the car forward, with the aid of the fan and the air passages through the tubes in the radiator, be sufficient to combat the excessive heating? A. I don't believe so.

"Q. Now, Mr. Stout, I am going to hand you what has been introduced in evidence as Plaintiff's Exhibit No. 10, and I am going to ask you to examine that radiator hose, particularly the break. A . (Witness examines exhibit).

"Q. Do you have an opinion, after examining Plaintiff's Exhibit No. 10, this hose, where the force would have to be applied on this hose to effect a break like that? A. Yes.

"Q. Where would the force have to be applied? A. Being attached at both ends, it would have to be applied somewhere near the middle.

"Q. Somewhere near the middle; * * *

"Q. If a hose breaks, or a pipe-like object breaks from pressure, how does the break usually evidence itself? A. The break usually is evidenced parallel to the long section of the pipe.

"Q. And why is that? A. Because mathematically we can prove that the bursting force in a round, circular section is twice as great along this way (indicating) as it is along this way (indicating); and again, when you have pressure in the system, you can see that those lines tend to expand due to the internal pressure. The internal pressure is even all the way around, nevertheless those lines do tend to expand.

"Q. And you are illustrating again with a round white plastic object with a sort of a graph illustration around one-half of its diameter; and for the record, you indicated that when pressure was applied from the center of this object out that it expands along these lines (indicating), is that correct? A. Yes, that's correct.

"Q. And further, that if there were a pipe, that these lines depicted on this illustrative device indicates where the splitting

would take place? A. That's right—along the lines, like this (demonstrating).

"Q. Would it split through its diameter? A. You mean like this (indicating)?

"Q. Yes. A. It is not near as likely to.

"Q. And you indicated that it takes twice as much force to— A. To rupture it this way (indicating), splitting the thing along this way (indicating).

"MR. ROTH: I see; we have no further questions of the witness."

The hose that was on the car and introduced as an exhibit was broken cross-wise rather than "longitudinally" as this witness said would occur from an internal rupture.

Concerning Virgil's statement that he had tightened the starter bolts with his fingers, the testimony of the witnesses for the defendant was that it was physically impossible for Virgil to have tightened all three lugs on the starter if they were loose, with an open-end wrench, from the position underneath the car, that Virgil could not have touched the bolts with his fingers because of the hot (2,600°) manifold just one-half inch away. Too, that in a garage, such a repair job by a mechanic calls for a special wrench to tighten up the three starter lugs.

To disprove appellant's allegation that the respondent had so performed repair work that a "wrinkle or crease was left in the head gasket, through which exhaust gases were pumped into the cooling system causing extreme heat and pressure," respondent produced the witnesses who performed the work on the car. They testified as has previously been stated that the installation was done by a competent mechanic of many years' experience and as provided by the Ford manual for 1958. Too, that the temperature gauge was normal and that with a new radiator cap safety release valve, if there was any excessive heat and resulting pressure said pressure would "pop the release valve before any other portion of the system (including the hose) would rupture."

Appellant made much of the fact that they had nothing but trouble with the car, including considerable trouble after the accident, and that Mr. Bostwick saw the wrinkle in the gasket when he took the car to the respondent's garage and had the head removed. The respondent's mechanics testified that they did not see the wrinkle referred to by Mr. Bostwick, that no issue was made of it at the time they removed the gasket nor was any request made to save the gasket for later use as evidence. The gasket was not available at trial due to the fact it was routinely disposed of at the garage.

Recognizing that the appellant had considerable difficulties with the car after the accident in June, as to this testimony it must be realized that these incidents occurred after the accident, and quite probably after serious damage to the car and would not give a true picture of the conditions at the time of the accident.

The case was well and fully tried by counsel for both parties. The trial judge gave just about all of the instructions requested by the appellant yet on the facts the jury returned a verdict for the respondent.

To their verdict the appellant brings to this court four specifications of error:

1. In refusing to instruct the jury to disregard the issue of contributory negligence as proposed in plaintiff's Instruction No. N;

2. In that the verdict is not supported by the evidence;

3. In refusing to invoke the doctrine of *res ipsa loquitur* against the defendent as proposed in plaintiff's Instruction No. O; and

4. In refusing to give plaintiff's Instruction No. T.

Concerning appellant's specification of error No. 1, the appellant alleges error in the trial court's failure to give proposed Instruction N, which reads as follows:

"You are instructed that under the evidence in this case, defendant is not entitled to the defenses of contributory negli-

gence or assumption of the risk and that, therefore, you should eliminate, in your consideration of this case, any deliberation of whether plaintiff was guilty of contributory negligence or assumption of the risk."

The above proposed instruction was offered by the appellant after the court had refused the respondent's two proposed instructions on assumption of risk and one on contributory negligence. In so refusing the respondent an opportunity to put the theory of his case to the jury, the questions raised by respondent's proposed instructions disappeared from the case and the appellant's instruction was unnecessary.

While denied by appellant that there was any evidence of either assumption of risk or contributory negligence in the case, the record is that respondent did raise these defenses in his answer, and the respondent's case most certainly was tried with the view of showing the court and jury that the accident happened in a manner different than what the appellant alleged and testified to at trial.

However, in view of the jury's finding for respondent no comment is required, since, considering all the instructions given by the court, the jury was properly instructed insofar as appellant was concerned.

Appellant's second specification of error is that the verdict is not supported by the evidence.

We have reviewed at some length the fact situation in this case because it is important that both sides carefully and fully had their case presented to the jury. Also, the presiding judge gave most of appellant's instructions and thereby created a favorable climate with the jury insofar as appellant's case was concerned.

The law has long been established in this type of negligence case that it is incumbent upon the plaintiff to present evidence from which it may reasonably be inferred that the negligent conduct on the part of the defendant was the proximate cause of plaintiff's injuries. See Thompson v. Llewellyn,

136 Mont. 167, 346 P.2d 561; Western Auto Supply Agency v. Phelan (9th Cir. 1939) 104 F.2d 85; Boepple v. Mohalt, 101 Mont. 417, 54 P.2d 857.

██ Here, after presenting a most carefully tried case the jury found against the plaintiff-appellant. We have long held to the rule that we will not overturn the holding or findings of a trial court unless there is a decided preponderance of the evidence against them and, when the evidence fully considered furnishes reasonable grounds for different conclusions, findings will not be disturbed. See Platt v. Clark, 141 Mont. 376, 378 P.2d 235; Feely v. Lacey, 133 Mont. 283, 322 P.2d 1104; Jessen v. O'Daniel, 136 Mont. 513, 349 P.2d 107.

The appellant's third specification of error concerns the court's refusal to invoke the doctrine of *res ipsa loquitur* against defendant as requested in the plaintiff's proposed Instruction O.

Proposed Instruction O reads:

"You are instructed that from the happening of the accident involved in this case, as established by the evidence, there arises an inference that the proximate cause of the occurrence was some negligent conduct on the part of the defendant. That inference is a form of evidence, and if there is none other tending to overthrow it, or if the inference preponderates over contrary evidence, it warrants a verdict for the plaintiff. Therefore, you should weigh any evidence tending to overcome that inference, bearing in mind that it is incumbent upon the defendant to rebut the inference by showing that it did, in fact, exercise by showing that it did, in fact, exercise ordinary care and diligence or that the accident occurred without being proximately caused by any failure of duty on its part."

To the trial judge's refusal to give this instruction we concur. This court many times has said that certain elements are necessary in *res ipsa loquitur* cases, these being:

(1) The defendant having exclusive control of the offend-

ing instrumentation possesses the knowledge of the cause of the accident, and the plaintiff does not;

(2)   The injured person must be without fault;

(3)   That the injury would not ordinarily occur if the defendant, the one having control, had used ordinary care; and

(4)   The thing that causes the injury must be in the exclusive control of the defendant at the time of the injury.

This court in consideration of the *res ipsa loquitur doctrine* said in Jackson v. William Dingwall Co., 145 Mont. 127, 399 P.2d 236: " 'The *res ipsa loquitur doctrine* simply stated is this: [t]hat when an instrumentality which causes injury, without any fault of the injured person, is under the exclusive control of the defendant at the time of the injury, and the injury is such as is in the ordinary course of things does not occur if the one having such control uses proper care, then the law infers negligence on the part of the one in control as the cause of the injury.' Whitney v. Northwest Greyhound Lines, 125 Mont. 528, 533, 242 P.2d 257, 259."

Our latest discussion of the *res ipsa loquitur doctrine* in Montana in Krohmer v. Dahl Funeral Home, 145 Mont. 491, 402 P.2d 979, clarified the doctrine in Montana. But under the facts of this case it has no application.

Here the appellant could not rely on this doctrine, nor should he have been allowed the instruction in question, for the important element of exclusive control was not present. Too, the very issue of the case, whether or not Virgil was without fault, was decided by the jury in finding that Virgil "was not without fault."

The fourth specification of error goes to the trial judge's refusal to give proposed Instruction T which reads as follows:

"You are instructed that where the injury results from two or more causes for all of which the defendant is liable, it is immaterial which was the proximate cause."

We find no error in refusing this instruction for it is

repetitious of Instruction No. 7 given by the court which was as follows:

"You are instructed that it is not incumbent upon the plaintiff to prove all of the acts of negligence alleged in the complaint to entitle plaintiff to a verdict in this case, but if the evidence introduced is such as to satisfy you by a preponderance of all the evidence herein, that one or more of said acts of negligence so alleged proximately caused injury to Virgil W. Bostwick, then your verdict should be for the plaintiff."

Finding no reversible error the verdict of the jury is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR, DOYLE and CASTLES concur.